**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAULA MARY BOWEN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:13-cv-731 |
| | ) | |
| v. | ) | |
| | ) | Judge Mark R. Hornak |
| GREGORY RANDOM BOWEN, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Before the Court is Paula Mary Bowen's Verified Complaint/Petition for Return of Child ("Verified Petition"), pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), T.I.A.S. No. 11,670, 19 I.L.M. 1501 (Oct. 25, 1980),[1] in which Ms. Bowen seeks the return of her ten year-old child, Gregory Patrick Bowen ("Patrick"), to Northern Ireland. For the reasons set forth below, this Court will deny Ms. Bowen's Verified Petition.

## I.    BACKGROUND

The saga of the Bowens' marriage is one fraught with turmoil. The following facts are derived from the record in this case, including the Verified Petition, ECF No. 1, Mr. Bowen's Answer, ECF No. 5, the evidentiary hearings, the *Guardian ad Litem*'s reports, ECF Nos. 19 and 26, and the exhibits submitted into evidence.[2]

---

[1] Congress implemented the Hague Convention in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601, *et seq.*. *See generally Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995) (discussing Congress's adoption of the Hague Convention in ICARA).

[2] The Court had the opportunity to observe the testimony and demeanor of the witnesses in this case, and to the extent any testimony was controverted, the facts set forth below reflect this Court's assessment of credibility.

Ms. Bowen, the Petitioner, is Caucasian and a citizen of Northern Ireland, and the Respondent, Mr. Bowen, is an African-American citizen of the United States. Mr. Bowen is unemployed and resides in Pittsburgh, Pennsylvania, where he receives Supplemental Security Income ("SSI") and Patrick's welfare checks. Ms. Bowen lives off welfare and her savings in Northern Ireland. The litigants met in Pittsburgh while Ms. Bowen was working at a Pittsburgh hotel on a visa exchange program. The Bowens married on July 30, 2002, and shortly thereafter moved to Tennessee, where Patrick was born on April 10, 2003.[3]

The parties' marriage was tempestuous from the start, and they separated for a period of time in Tennessee. Upon reconciling, the Bowens moved to Florida, where Mr. Bowen served jail time for cocaine possession. Ms. Bowen testified that while the parties were together in Florida, Mr. Bowen threw an ash tray at her and she obtained a restraining order against him. Then in November of 2005, Ms. Bowen, pregnant with the parties' next child, Chloe, moved back to Northern Ireland, taking Patrick with her. Chloe was then born.

Mr. Bowen traveled to Northern Ireland in 2006, seeking to reconcile with Ms. Bowen. They reconciled and on September 3, 2007, Ms. Bowen gave birth to their third child, Paul. Ms. Bowen testified that the Bowens' marriage was peaceful until 2007, when Mr. Bowen developed an addiction to pain medication and sought out recovery at a methodone clinic. Ms. Bowen testified that Mr. Bowen was abusive towards her, and that during one episode, Mr. Bowen shouted at her and grabbed her arm, such that she left Mr. Bowen, out of fear, to stay at a women's shelter for about a month. She also obtained a restraining order against him. Mr.

---

Further, it is the Court's intention that the facts recited in this Opinion constitute its findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1).

[3] He is, therefore, a natural born citizen of the United States. 8 U.S.C. § 1401(a).

Bowen, on the other hand, testified that he never hit or threatened to hit Ms. Bowen, and that he witnessed approximately seven (7) occurrences when Ms. Bowen hit Patrick on the head.

While Ms. Bowen was living at the women's shelter, Mr. Bowen applied for and was granted visitation to see the parties' children. Around the summer of 2011, the parties reconciled. Ms. Bowen testified that while the family was together in Northern Ireland, Patrick did not experience any incidents of racism at school. Ms. Bowen also testified that Mr. Bowen exaggerated his experience with racism in Northern Ireland, and explained that she and he conspired with a mutual friend to set up an April 14, 2012 firebombing of Ms. Bowen's vehicle. After she and he executed this plan, Mr. Bowen claimed that the firebombing was a racist attack, when instead it was a ploy to get the insurance proceeds from Ms. Bowen's destroyed car. Ms. Bowen testified that she received approximately 1,000 Pounds (GBP) in insurance proceeds from her firebombed vehicle, money that she then used for household bills, food, and looking after her children. Mr. Bowen maintained during his testimony that Ms. Bowen's admission under oath was the first he had heard of any firebomb-related insurance fraud plot, and surmised that Ms. Bowen's vehicle was probably firebombed to harass his family.[4]

In May of 2012, Ms. Bowen received inheritance money from her mother. Ms. Bowen used this money to buy five (5) one-way plane tickets for her, Mr. Bowen, and their three children, so that the Bowen family could relocate to the United States. Meanwhile, Ms. Bowen had a ten-year ban on her visa to enter the United States, which she claims was due to her overstaying her visa during her previous visit to this country, and which Mr. Bowen claims was due to her removal of Patrick from the United States in 2005, and the ensuing (but unrelated)

---

[4] Based on Ms. Bowen's sworn admission of such a plot, the Court advised the parties, on the record, that it had brought all such testimony by the Bowens to the attention of the United States Attorney for this District. The Court also entered an Order enjoining Patrick's removal from Allegheny County, Pennsylvania. ECF No. 21; *see* 42 U.S.C. § 11604(a); *see also* 28 U.S.C. § 1651.

legal proceedings at that time. No party presented any documentation or corroborating evidence of their respective "visa explanation."

Ms. Bowen's Verified Petition sets forth that it was the shared intention of her and her husband to relocate their family to the United States. Verified Petition at ¶ 12. Mr. Bowen and Patrick ultimately relocated to the United States. However, Ms. Bowen testified that due to difficulties in her marriage and her visa complications, she ultimately "decided" not to relocate to the United States. Ms. Bowen contends that she never contemplated that Patrick and Mr. Bowen would move to the United States permanently and without her and the remainder of the family. *Id.* at ¶ 18. Ms. Bowen expanded upon this premise in her testimony, stating that she wanted Mr. Bowen to stay in Northern Ireland until her visa situation was resolved but Mr. Bowen disagreed, and she did not protest because she was afraid of him.

Mr. Bowen testified that on the day that the Bowens were all supposed to leave Northern Ireland, their travel agent informed them that Ms. Bowen's visa problems persisted. Mr. Bowen contends that he and Ms. Bowen agreed that he and Patrick would depart as scheduled for the United States, where Mr. Bowen would work to resolve Ms. Bowen's visa issues so that the family could reunite. Mr. Bowen also stated that he could not stay in Northern Ireland because his legal immigration status there had expired, and he could not obtain his necessary disability benefits.

On July 20, 2012, Mr. Bowen and Patrick left Northern Ireland for the United States, where they moved in with Clara Jones, Mr. Bowen's ex-sister-in-law, and her husband Ricky Jones, in Pittsburgh, Pennsylvania. After arriving in Pittsburgh, Mr. Bowen swiftly made inquiries about legal representation to resolve Ms. Bowen's visa issue. He paid $500.00 to

Attorney Mark A. Goldstein and signed a July 24, 2012 representation agreement with Goldstein and Associates for immigration legal services. *See* Resp.'s Answer, ECF No. 5, at 9.

In November of 2012, Ms. Bowen wrote a letter to Mr. Bowen asking that he "do the right thing" and return Patrick to Northern Ireland. However, from the time of Mr. Bowen and Patrick's arrival in Pittsburgh until Mr. Bowen was served with Ms. Bowen's Verified Petition, Mr. Bowen spoke on a weekly basis with Ms. Bowen, and Mr. Bowen testified that he was under the impression that Ms. Bowen and their other children still planned to move to the United States after Ms. Bowen's visa issues were straightened out.

Mr. Bowen testified that in late May of 2013, he learned that Child Protective Services in Northern Ireland had allegedly removed the parties' two other children from Ms. Bowen's care and custody as a result of their youngest child's claims that Ms. Bowen pushed him down a flight of stairs.[5] On May 24, 2013, Ms. Bowen filed a Verified Petition in this case, seeking the return of Patrick to Northern Ireland, Patrick's alleged habitual residence, pursuant to the Hague Convention. On June 11, 2013, Mr. Bowen was served with Ms. Bowen's Verified Petition.

On September 20, 2013, this Court appointed Patricia L. Dodge, an attorney admitted to practice law in Pennsylvania and before this Court, as *Guardian ad Litem* for Patrick, to represent his interests as a citizen of the United States in this action.[6] On December 12, 2013, Ms. Dodge (hereinafter "*GL*") filed a Summary Report of Guardian ad Litem ("Summary Report"), in which she set forth her assessment of Patrick and Patrick's interests after meeting with him on two occasions at his current residence in Pittsburgh, Pennsylvania.

---

[5] No documentary, corroborating or contradicting evidence was presented by any party on this point.

[6] The Court did so not in deference to "the best interests of the child," but because it was plain to the Court that the effect of the Court's granting of the relief sought by Ms. Bowen would be to subject a natural-born United States citizen (Patrick) to the exclusive jurisdiction of the courts of a foreign state in a situation in which the Court had little confidence that either parent would speak up for Patrick's United States citizenship interests. The Court expresses its profound gratitude and appreciation to Ms. Dodge for her willingness to undertake these duties. Her service and professional conduct reflects the highest calling and traditions of our profession.

On December 16 and 17, 2013, this Court held an evidentiary hearing on Ms. Bowen's Verified Petition. During this two-day hearing, Ms. Bowen testified from Northern Ireland via video conference, and Mr. Bowen testified before this Court.[7] At the hearing, the *GL* stated that Patrick had been told, since the *GL*'s last visit, that Ms. Bowen would not be moving to the United States with his siblings. The *GL* explained that she would visit Patrick again and evaluate the minor child's interests in light of this development in the case. On January 21, 2014, the *GL* filed a Supplemental Report of Guardian ad Litem ("Supplemental Report"), in which she set forth her impressions and conclusions regarding Patrick's interests after meeting with him again and reviewing his school records that she obtained from Fairless Intermediate School[8] (which she subsequently filed under seal with this Court).

## II. DISCUSSION

### A. Legal Framework

#### 1. Hague Convention

The Hague Convention is a multilateral treaty on parental kidnapping to which the United States and the United Kingdom are signatories. *See* 53 Fed. Reg. 23843-01. The federal International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.* ("ICARA"), implements the Hague Convention and entitles a person whose child has been wrongfully removed to the United Sates to petition a federal court to order the child returned.[9] 42 U.S.C. § 11603(b); *see Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007) ("A person

---

[7] On December 2, 2013, this Court entered a Scheduling Order, requiring the parties to notify the Court if any party believed that after reviewing the proposed findings of fact and conclusions of law, related memoranda, and the *GL*'s report, the presence of the minor child was required at the anticipated evidentiary hearing for examination by them or the Court. Neither party so notified the Court, then or thereafter, and expressly disclaimed the need to do so.

[8] Fairless Intermediate School is in the Woodland Hills (PA) School District.

[9] ICARA provides that "[t]he court in which an action is brought under subsection (b) of this section shall decide the case in accordance with the Convention." 42 U.S.C. § 11603(d).

claiming that a child has been wrongfully removed to or retained in the United States can commence judicial proceedings under the Hague Convention by filing a petition for the return of the child in a state or federal court which has jurisdiction where the child is located.") (citing 42 U.S.C. § 11603(b)).

The Hague Convention reflects a universal concern about the harm done to children by parental kidnapping, the belief that persons "should not be permitted to gain custody of children by virtue of their wrongful removal or retention," and that "only concerted cooperation pursuant to an international agreement can effectively combat" the problem of the increase in international abductions and retentions of children. 42 U.S.C. § 11601(a)(1)-(4). Indeed, the two main objects of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1.

Importantly, the Convention's procedures are not designed to settle international custody disputes, but rather, to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases. *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005); *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); *id.* at art. 16 (providing that "until it has been determined that the child is not to be returned under the Convention," the state to which the child has been removed or in which the child has been retained "shall not decide on the merits of rights of custody"). Ultimately, "the Hague Convention is designed to put all participants in a custody dispute back into the positions they would have been in but for one parent's wrongful removal of the child. It

is not, and was never meant to be, a vehicle for determining custody rights." *Carrascosa v. McGuire*, 520 F.3d 249, 260 (3d Cir. 2008).

### 2. Wrongful removal.

To secure the return of an abducted child under the Hague Convention, the petitioner must first prove by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1). Under Article 3 of the Convention, removing a child from a country is wrongful where:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph [a] above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3. Our Court of Appeals has enunciated four questions that must be answered in a wrongful removal or retention case: (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention. *Tsui*, 499 F.3d at 270-71.

A child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). "This approach considers a child's experiences in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming

meaningful connections with the people and places she encountered in a country prior to the retention date." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006) (internal citation omitted).

### 3. Defenses.

Once a petitioner establishes that removal was wrongful, the child must be returned unless the respondent can establish one of five defenses. Three of these defenses can be established by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B): the proceeding was commenced[10] more than one year after the removal or retention of the child, and the child has become settled in his or her new environment, Hague Convention, art. 12; the person seeking return of the child consented to or subsequently acquiesced in the removal or retention, *id.* at art. 13(a); or the judicial authority "finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," *id.* at art. 13.

The other two defenses must be shown by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A): there is a grave risk that the return of the child would expose him or her to physical or psychological harm, or otherwise place the child in an intolerable situation, Hague Convention, art. 13(b); or, the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *id.* at art. 20; *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). The affirmative defenses are narrowly construed to effectuate the purposes of the Convention, 42 U.S.C. § 11601(a)(4), and a court's finding of an exception under Article 13 does not automatically preclude an order of return. *Baxter*, 423 F.3d at 368 (citing *Friedrich*, 78 F.3d at 1067). A court retains the discretion to order the return of a child, despite the existence of a

---

[10] The term "commencement of proceedings," as used in Article 12 of the Convention, "means, with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section." 42 U.S.C. § 11603(f)(3).

defense, if return would further the aim of the Hague Convention that is to provide for the return of a wrongfully removed child. *Tsui*, 499 F.3d at 278 (quoting *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007)).

## B. Mr. Bowen's allegedly wrongful removal of Patrick to the United States.

### 1. The date of the allegedly wrongful removal.

The first question this Court must answer in a wrongful removal or retention case under the Hague Convention is when the removal or retention took place. *See Tsui*, 499 F.3d at 270. Ms. Bowen avers that "Patrick was wrongfully retained in the United States on or about July 20, 2012, when Respondent travelled with Patrick from Northern Ireland to the United States." Pet'r's V. Pet. at ¶ 10. In her Verified Petition, Ms. Bowen uses the word "retention," rather than the word "removal," when referring to Patrick's contested presence in the United States, explaining that while "[i]t was the intention of the Petitioner and the Respondent, along with their three (3) children (including Patrick) to relocate to the United States, . . . [d]ue to difficulties in the marriage, along with the visa complications, the Petitioner ultimately decided not to relocate to the United States. Nonetheless, the Respondent and Patrick went ahead to the United States." *Id.* at ¶ 12. Thus, in essence, Ms. Bowen contests Mr. Bowen's initial removal of Patrick to the United States, as opposed to solely Mr. Bowen's retention of Patrick in the United States after their arrival in Pittsburgh. Mr. Bowen does not contest this mode of analysis. On July 20, 2012, Mr. Bowen took Patrick with him when he relocated to Pittsburgh from Northern Ireland. Therefore, the allegedly wrongful removal took place on July 20, 2012.[11]

### 2. Patrick's habitual residence.

This Court must next determine the habitual residence of Patrick immediately prior to his removal. As set forth above, a child's habitual residence is "the place where he or she has been

---

[11] The Verified Petition was filed within one (1) year of this date, on May 24, 2013. *See* Hague Convention, art. 12.

physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224. This analysis "considers a child's experiences in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292. Determining a child's habitual residence is a fact-intensive analysis, and "necessarily varies with the circumstances of each case." *In re Application of Adan*, 437 F.3d 381, 392 (3d Cir. 2006) (internal quotation omitted).

In reaching a habitual residency determination, a court must also consider the "parents' present, shared intentions regarding their child's presence in a particular location." *Tsui*, 499 F.3d at 272 (citing *Baxter*, 423 F.3d at 369 (internal quotation omitted)). *Karkkainen* involved determining the habitual residency of an eleven-year old child, and the Third Circuit explained the contours of the Hague Convention analysis of parents' shared intent, vis à vis the age of the child in question. *Karkkainen*, 445 F.3d at 296.

> "*Feder* requires that we give independent weight to [the] parents' *shared* intent. We have held that, in cases involving very young children, the shared intent of the parents in determining the residence of their children is of paramount importance and acclimatization is secondary. . . . Thus, shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country. We give somewhat less weight to shared parental intent in cases involving older children . . . . who have reached an age where they are capable of becoming "firmly rooted" in a new country. In such cases, our attention generally turns first to the child's perspective, not the parents' intent. But shared parental intent remains relevant to habitual residence in *all* cases under the Hague Convention. . . . When the parents share an intent as to the child's habitual residence, it must be given some weight. Were a court to exclude shared parental intent entirely from the habitual residence inquiry, and instead focus solely on a child's contacts and experiences, it would fail to consider whether a parent is acting unilaterally to alter what was jointly intended or agreed upon.

*Karkkainen*, 445 F.3d at 296 (emphasis in original) (internal quotations and citations omitted).

Up until Mr. Bowen relocated with Patrick to the United States on July 20, 2012 when Patrick was nine years old, Patrick had lived in Northern Ireland since 2005, when Ms. Bowen and Patrick moved there from Florida. Patrick had formed meaningful relationships with his mother's Northern Ireland family, was enrolled in school in Northern Ireland, and participated in activities at the Bosco Youth Club in Newry. Until his departure for the United States in 2012, Patrick had lived in Northern Ireland for the majority of his life, and, from Mr. Bowen's 2006 arrival there, Patrick and his parents had a marked degree of settled purpose in Northern Ireland. While parents' shared intent is not dispositive in wrongful removal or retention cases involving older children, *see Karkkainen*, 445 F.3d at 296, Mr. and Ms. Bowen had a shared intent, up until Patrick finished out the school year at St. Patrick's Primary School in Newry, *see* ECF No. 28-1 at 2, and left for the United States with Mr. Bowen, that Patrick would reside in Northern Ireland. It follows that Northern Ireland was Patrick's habitual residence immediately prior to his July 20, 2012 departure for the United States, and this Court so finds and concludes.

### 3. Whether Mr. Bowen's removal of Patrick was in breach of Ms. Bowen's custody rights under the law of Northern Ireland.

The internal law of the child's habitual residence applies in determining a parent's custody rights under the Convention. *See Feder* 63 F.3d at 221; *Tsui*, 499 F.3d at 275; *Adan*, 437 F.3d at 391. Mr. Bowen does not dispute that Ms. Bowen had rights of joint custody under Northern Ireland law. Pursuant to Article 14 of the Hague Convention, a court "may take notice directly of the law of . . . the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law." Hague Convention, art. 14; *see also* Fed. R. Civ. P. 44.1.

This Court has concluded that Northern Ireland was Patrick's habitual residence at the time of his removal, so Northern Ireland law determines whether Ms. Bowen had a right of

custody to Patrick. Under The Children (Northern Ireland) Order 1995, "[w]here a child's father and mother were married to each other at the time of his birth, they shall each have parental responsibility for the child." The Bowens were married at the time of Patrick's birth. *See* Pet'r's Ex. B, ECF No. 1-2, at 2; Pet'r's Ex. C, ECF No. 1-3 at 2. As a result, under Northern Ireland custody law, as Mr. Bowen does not dispute, both parents shared custody and neither parent could unilaterally elect to remove Patrick from Northern Ireland over the other parent's objections. Mr. Bowen relocated with Patrick to the United States and Ms. Bowen alleges that Mr. Bowen is keeping Patrick in the United States in a unilateral attempt to establish a new residence for Patrick. It follows that Ms. Bowen has properly alleged that Mr. Bowen acted in violation of Ms. Bowen's rights of custody under Northern Ireland law.

### 4. Whether Ms. Bowen was exercising her custody rights at the time of Patrick's alleged removal.

The final determination this Court must make in its wrongful-removal analysis is whether Ms. Bowen was exercising her custody rights at the time of Patrick's alleged removal. "[T]he test for finding the non-exercise of custody rights under the Hague Convention is stringent." *Baxter*, 423 F.3d at 370 (citing *Friedrich*, 78 F.3d at 1065-66). Indeed, "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. . . . [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich*, 78 F.3d at 1065-66.

Here, as Mr. Bowen does not contest, Ms. Bowen was exercising her custody rights at the time of Patrick's removal from her care in Northern Ireland. Ms. Bowen brought Patrick with

her when she moved to Northern Ireland in 2005, and Patrick lived with her at all times until Mr. Bowen took Patrick with him to the United States in July of 2012. Thus, Ms. Bowen has more than met the threshold requirement of keeping "regular contact" with Patrick. The record is also devoid of any indication that Ms. Bowen unequivocally abandoned Patrick, nor does Mr. Bowen represent that such an abandonment occurred. Therefore, this Court finds and concludes that Ms. Bowen was exercising her custody rights at the time of Patrick's alleged removal.

Because this Court finds and concludes that (1) at the time of Patrick's removal (if such removal is considered to have occurred when he physically left Northern Ireland), his habitual residence was in Northern Ireland; (2) Patrick's removal was in breach of Ms. Bowen's custody rights; and (3) that Ms. Bowen was exercising her custody rights at the time of Patrick's removal, this Court finds and concludes that Ms. Bowen has thus proven by a preponderance of the evidence that Patrick was wrongfully removed within the meaning of the Hague Convention. *See* 42 U.S.C. § 11603(e)(1).

### C.    Mr. Bowen's Defenses

Once a petitioner has proven her *prima facie* case, "the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence." *Tsui*, 499 F.3d at 271 (quoting *Karkkainen*, 445 F.3d at 288). The affirmative defenses are narrowly construed, and even where a defense applies, the court retains the discretion to order the child's return. *Tsui*, 499 F.3d at 271.[12]

Mr. Bowen asserts three defenses under the Hague Convention. First, that "the person having care of the child had consented to or subsequently acquiesced in the removal." *See*

---

[12] The record also includes several allegations between the parties regarding their respective fitness as parents. As the *Baxter* court advised, ""[a]ssessment and disposition of these kinds of allegations are normally reserved for a custody proceeding. As noted, the Convention addresses jurisdiction and not the merits of custody disputes." *Baxter*, 423 F.3d at 374 n. 9.

Hague Convention, art. 13(a). Second, that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *See id.* at art. 13(b). And third, that "the judicial authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *See id.* at art. 13.

### 1.    Ms. Bowen's consent.

As for Mr. Bowen's first defense, Ms. Bowen's consent, Mr. Bowen must establish that this defense applies by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B). Mr. Bowen contends that his removal of Patrick was not wrongful because it was done with the knowledge and consent of Ms. Bowen. "Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a). Often, the petitioner grants some measure of consent, such as permission to travel, in an informal matter before the parties became involved in a custody dispute." *Baxter*, 423 F.3d at 371. An analysis of a respondent's consent defense focuses in on "the petitioner's subjective intent." *Id.* Furthermore, "in examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.* In particular, "[t]he nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Id.*

In her Verified Petition, Ms. Bowen conceded that "[i]t was the intention of the Petitioner and the Respondent, along with their three (3) children (including Patrick) to relocate to the United States, and one-way plane tickets were purchased for all five (5) family members." Pet'r's V. Pet. at ¶ 12. However, Ms. Bowen claims that because her visa problem was not

solved by the parties' July 20, 2012 anticipated departure date, and because of "difficulties in the marriage," "[Ms. Bowen] ultimately decided not to relocate to the United States." *Id.*

The record reflects that Ms. Bowen and Mr. Bowen did, as Mr. Bowen represents, come to an agreement that Mr. Bowen would go ahead and relocate to the United States with Patrick on July 20, 2012, work to resolve Ms. Bowen's visa issues, and that Ms. Bowen would bring the remainder of the family to the United States when that resolution was reached. Consistent with this plan of action is the July 24, 2012 Representation Agreement that Mr. Bowen entered into with Pittsburgh attorney Mark A. Goldstein, four (4) days after Mr. Bowen's arrival in the United States. *See* Resp. Answer at 9. The Representation Agreement sets forth that Mr. Bowen "agree[d] to engage the services of Mark A. Goldstein, Esq., of Goldstein & Associates, LLC, in the following matter on behalf of Paula Mary Bowen: Consular Processing, at a cost of $1,000.00 for legal services." *Id.* Moreover, Mr. Bowen "agree[d] to pay $500.00 for the initiation of this matter, to Goldstein & Associates, LLC," and ultimately did pay the sum of $500.00 cash to Goldstein & Associates that same day. *Id.*

As for Ms. Bowen, instead of altogether cancelling her plan to join Mr. Bowen and Patrick in the United States, Ms. Bowen testified that she *postponed* the departure date of her one-way plane ticket to September 2012, and did the same for her other children, Chloe and Paul. While these tickets eventually went unused due to the continuing ban on Ms. Bowen's travel to this country,[13] Ms. Bowen's choice to postpone her one-way departure to the United States rather than outright cancel her family's relocation plans strongly demonstrates the reality that the Bowens indeed had come to an agreement that their family would permanently relocate to the United States, with Ms. Bowen's visa ban only temporarily putting a wrench in the family's relocation plans until Mr. Bowen could resolve that visa problem, state-side.

---

[13] According to Mr. Bowen, Ms. Bowen's visa ban will not be lifted until October 6, 2014.

At the evidentiary hearing, Ms. Bowen did testify that she felt coerced to leave her home country of Northern Ireland. While she had found the courage to temporarily separate from Mr. Bowen in 2004 and 2010, Ms. Bowen testified that "she knew what the consequences would be" if she prevented Mr. Bowen from leaving for the United States in July of 2012. Ms. Bowen stated that she was afraid of Mr. Bowen and that on various occasions in the past, he grabbed her, pushed her up against a wall, pulled her into a car, threw an ash tray at her, and was verbally abusive.

However, Ms. Bowen testified that (1) she did not change Patrick's one-way plane ticket to prevent Mr. Bowen from taking Patrick with him to the United States; (2) she did not notify any law enforcement or other authorities of Mr. Bowen's departure with Patrick, either while she and her mother were waiting with Patrick and Mr. Bowen for their bus to Dublin (where their flight would depart for the United States), or at any time thereafter when Patrick and Mr. Bowen were en route to the United States; and (3) she did not cancel her one-way tickets for herself and her other children to relocate to the United States. Instead, Ms. Bowen chose to *reschedule* all of their one-way tickets for two months later. After reviewing the record as a whole, this Court finds and concludes that Ms. Bowen indeed consented to Patrick's departure with Mr. Bowen, and the scope of this consent was that Patrick would depart for the United States with his father, as part of the Bowens' ultimate plan to relocate to and unify their family in the United States.[14]

Article 13(a) of the Hague Convention sets forth, hand in hand, the defenses of consent and acquiescence, when it provides that even if the court finds that the child has been wrongfully removed or retained, the court is not required to order the return of the child if the respondent

---

[14] In this regard, the Court does not find credible Ms. Bowen's assertions that "marriage difficulties" had anything to do with her not coming to the United States, at the time of the flight or at any time thereafter. Instead, her testimony and the balance of the evidentiary record makes plain to the Court that the only reason she and the other children did not join Mr. Bowen and Patrick was her visa issue. Based on the Court's assessment of the entire record, but for that, she is on the plane and the family is together in the United States.

establishes that "the person . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a). "Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow. The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter*, 423 F.3d at 371. "[A]cquiescence has been held to require an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time. Courts have held that the acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced." *Id.* (internal citation omitted).

Here, there is no indication in the record that Ms. Bowen either testified in a judicial proceeding that she acquiesced to Patrick's removal, or that she executed a written renunciation of rights. What the record does reveal, however, is that Ms. Bowen's actions demonstrate a consistent pattern, over at least four months' time, of consent to and acquiescence in Patrick's removal: from July 20, 2012 when she and her mother accompanied Mr. Bowen and Patrick to the bus stop to leave for Dublin; through when Ms. Bowen changed the one-way tickets (which she paid for with her money) to the United States for her and her children from July of 2012 to September of 2012; through when Mr. Bowen hired a lawyer shortly after his arrival in Pittsburgh in an attempt to resolve Ms. Bowen's visa ban; until she, as she testified, wrote a letter to Mr. Bowen in November of 2012, seeking Patrick's return to Northern Ireland. While the Court is tasked with looking at the "subjective intent" of Ms. Bowen when analyzing whether or not she acquiesced, and Ms. Bowen did testify that she could not move to the United States

because of her visa problems and did not want to move due to the parties' marriage difficulties, Ms. Bowen's subjective intent is most clearly manifested in the concrete actions she took in acting in accordance with the parties' plan to relocate the entire Bowen family to the United States. Thus, this Court finds and concludes that Ms. Bowen's actions demonstrate not only her consent to Patrick's removal, but "a consistent attitude of acquiescence over a significant period of time."

### 2. Mr. Bowen's grave risk of harm defense.

As for Mr. Bowen's second defense, that there is a grave risk that Patrick's return to Northern Ireland would expose him to physical or psychological harm or otherwise place him in an intolerable situation, Mr. Bowen must establish that this defense applies by clear and convincing evidence. *See* 42 U.S.C. § 11603(e)(2)(A). The grave risk defense has been held to apply in at least two sets of cases: when return of the child puts the child in immediate physical danger, such as "returning the child to a zone of war, famine, or disease," or "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Baxter*, 423 F.3d at 373 (quoting *Friedrich*, 78 F.3d at 1069). As the *Baxter* court explained:

> The Court of Appeals for the Second Circuit has characterized the exception as follows: At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Baxter*, 423 F.3d at 373 (quoting and citing *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001)). The United States Department of State has provided similar guidance about the grave risk exception:

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent them petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm. 51 Fed. Reg. at 10,510.

*Baxter*, 423 F.3d at 373 n. 7 (also noting that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the government agencies charged with their negotiation and enforcement is entitled to great weight" (citing *United States v. Stuart*, 489 U.S. 353, 369 (1989)).

In *Adan*, the Third Circuit focused in on the "grave risk of harm" defense when it reviewed the district court's analysis of horrific allegations that the *Adan* respondent physically abused the petitioner and sexually abused their child. *Adan*, 437 F.3d at 395. The Third Circuit observed that "[t]here is little question that, under this standard, the abuse, sexual and otherwise, that [the petitioner] contends [the respondent] has inflicted on [the minor child] would, if true, qualify as an intolerable situation and grave harm for purposes of Article 13." *Adan*, 437 F.3d at 395. However, as the Third Circuit explained, "[t]he question, [] becomes whether [the petitioner] produced clear and convincing evidence of these allegations, and whether she established, as she must, that the courts in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id.* (quoting *Blondin*, 238 F.3d at 162).

The facts of this case fall short of demonstrating such a grave risk of harm by clear and convincing evidence. Mr. Bowen contends that "Patrick would be exposed to physical or psychological harm if this Court were to order him returned to Northern Ireland," explaining that Patrick "was subject to racial taunts and threats of violence" in Northern Ireland because of his African American race, and that Patrick "witnessed those same taunts and threats" directed at his father. Resp't's Resp. to V. Pet. ("Resp."), ECF No. 5, at 6. According to Mr. Bowen, before leaving Northern Ireland, Patrick was "very fearful of harm befalling himself and his family and it was affecting his school attendance and performance as well." *Id.* Mr. Bowen contends that if this Court ordered Patrick to return to Northern Ireland, Patrick would be placed in an intolerable living situation and exposed to physical or psychological harm, given that the parties' two other children had allegedly been temporarily removed from Ms. Bowen's care by Child Protective Services in late May of 2013, and Patrick would be placed in the same conditions that led to the intervention of Child Protective Services for his younger siblings.

Ms. Bowen countered that any racial discrimination faced by the Bowen family in Northern Ireland was infrequent and mostly directed at Mr. Bowen. Ms. Bowen testified that Patrick did not experience any incidents of racism at school in Northern Ireland. Ms. Bowen did testify that she recalled Patrick witnessing the Bowens' next-door neighbor screaming racial epithets at the Bowens' house and banging on their windows. Mr. Bowen testified that he lived in Northern Ireland without incident until 2008, when certain individuals, approximately twice a month, would call after him on the street, "N-, go back to America," and that on one occasion, an individual tried to hit him and Ms. Bowen with a car.

Regarding the intervention of Child Protective Services in Ms. Bowen's home in late May of 2013, Ms. Bowen testified that she did not push her youngest child down the stairs as

Mr. Bowen had alleged, that Child Protective Services conducted an investigation and determined that she had engaged in no wrongdoing, and that Patrick's younger siblings were never actually taken from her care.

In her Summary Report, the *GL* discussed Patrick's memories and observations regarding any racism he experienced in Northern Ireland, explaining that Patrick "said that Ireland was 'ok for him but not for his dad' from a racial point of view," and that Patrick "recounted some stories about problems that his father had experienced." Summ. Rep., ECF No. 19, at 2. The *GL* reported that Patrick "stated that he may have seen a little bit of [racism] himself at school but it did not appear to be a significant issue for him," *id.*, contrary to Mr. Bowen's testimony at the evidentiary hearing that Patrick was very fearful of the racism his family was experiencing, and that fear was affecting his performance in school.

Notably, Patrick's report card from his last year in Newry reveals scholastic performance seemingly unaffected by such external stressors. His report card provides that Patrick "was working well at his Reading this year," while he "has found areas of Maths difficult this year, [] with a little extra help he has made solid progress," that Patrick "really enjoyed the opportunities provided" for "creative activities focused around the use of computers and multi media equipment," that "Patrick, as in every other subject, has listened carefully in Science and has shown a great ability to work with other children in practical activities," and that "Patrick produced a great project on [the] Titanic." Ex. A, ECF No. 28-1, at 2.

Analyzing the parties' pleadings, testimony, and the *GL*'s reports, this Court concludes that while the intermittent racism that Mr. Bowen experienced in Northern Ireland is wholly reprehensible, and the intervention of Child Protective Services in Ms. Bowen's home is very troubling, there is insufficient record evidence for this Court to conclude that the return of the

child to Northern Ireland will "put[] the child in imminent danger," nor does the record reveal any "serious abuse or neglect, or extraordinary emotional dependence, when the court in [Northern Ireland], for whatever reason, may be incapable or unwilling to give the child adequate protection." *See Baxter*, 423 F.3d at 373.

While in their pleadings, the Bowens do not discuss the firebombing plot in any detail, this Court is gravely concerned with Ms. Bowen's unequivocal testimony at the evidentiary hearing that she participated in an admitted plan to firebomb her vehicle in order to reap the insurance payment proceeds. However, there is no indication that the Northern Ireland courts would be "incapable or unwilling to give [Patrick] adequate protection" should Ms. Bowen choose to again engage in dangerous criminal behavior, nor is there any indication that the Northern Ireland courts would be incapable of giving Patrick adequate protection from racial harassment and other related harm. Taking the record as a whole, the facts of this case fall short of demonstrating a clear and grave risk of harm to Patrick upon his return to Northern Ireland "that the court in the country of [Patrick]'s habitual residence may be incapable or unwilling to adequately protect the child." *See Adan*, 437 F.3d at 395 (citations omitted).[15]

### 3. "Wishes of the child" defense.

As for Mr. Bowen's third defense, that Patrick objects to being returned and has attained an age and degree of maturity at which it is appropriate for this Court to take account of Patrick's views, Mr. Bowen must establish that this defense applies by a preponderance of the evidence.

---

[15] This is a close call. Ms. Bowen testified, without hesitation and against her own interests, that she and Mr. Bowen conspired with a mutual friend to have that friend firebomb Ms. Bowen's car so that the Bowens could pocket the insurance proceeds. Ms. Bowen's testimony was credible. Mr. Bowen's denials were not. Thus, the Court is confronted with two parents who have in common what is likely a willingness to blow up their car in order to defraud an insurance company. Nonetheless, the issue of whether they are fit parents is a question for the court that will adjudicate Patrick's custody, and is outside the scope of this jurisdictional dispute. In any event, the record is devoid of any evidence that either parent has ever actually or potentially caused physical harm to Patrick, or placed his personal safety in jeopardy, or that the Northern Ireland courts would be incapable of giving Patrick adequate protection should the need arise. Therefore, this Court concludes that the "grave risk of harm" defense is not triggered by the firebombing plot.

42 U.S.C. § 11603(e)(2)(B). Article 13 of the Hague Convention provides that "[t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. As with all of the affirmative defenses under the Convention, this defense is to be construed narrowly. *Tsui*, 499 F.3d at 278. The "child's wishes can be the sole reason that a court refuses to order the return of the minor child to his or her habitual residence." *Id.* (internal citation omitted). However, the "court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis." *Id.* (citing *de Silva*, 481 F.3d at 1286).

The Third Circuit first analyzed the "wishes of the child" defense in *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259 (3d Cir. 2007). The *Tsui* court explained that "an analysis of whether to apply the 'wishes of the child' exception requires consideration of the goals of the Convention and a determination of whether the child is of sufficient age and maturity for his or her views to be taken into account." *Id.* at 279. "The Hague Convention does not set an age at which a child is automatically considered to be sufficiently mature." *Id.* Instead, the determination is to be made on a case-by-case basis. *Id.* The *Tsui* court noted that given the fact-intensive nature of the inquiry, decisions applying the "wishes of the child" exception are "understandably disparate." *Id.* (internal citation omitted). In analyzing a "wishes of the child" defense, the court "should also consider whether a child's desire to remain or return to a place is the product of undue influence, in which case the child's wishes should not be considered." *Id.* (citing Hague Convention Analysis, 51 Fed. Reg. at 10,509 ("A child's objection to being returned may be

accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.")).

Here, Mr. Bowen asserts that "Patrick has expressed a clear objection to being returned because of his fear in connection with the racial harassment, threats of violence and actual violence that occurred while he was living in Northern Ireland. Patrick is 10 years old, . . . and is a bright, mature child for his age." Resp. at 7. As such, Mr. Bowen requests that this Court take into account Patrick's views on returning to Northern Ireland. *Id.*

The *GL*'s reports on Patrick shed light on Patrick's views on returning to Northern Ireland, and demonstrate that Patrick has attained a degree of maturity at which it is appropriate for this Court to take account of those views. At the outset of her Summary Report, the *GL* noted that during her first two visits with Patrick at his residence in Braddock, he was "cooperative, engaging, and forthcoming." Summ. Rep. at 1. Contrary to his father's testimony, Patrick explained that "he may have seen a little bit [of racism] himself at school but it did not appear to be a significant issue for him." *Id.* at 2. According to the *GL*, during her first two visits with Patrick, he actually believed his mother and siblings were coming to the United States in 2014, and "stated that he d[id] not want to live in Northern Ireland, although he would like to visit it again." *Id.*

After the December 2013 evidentiary hearing, the *GL* visited Patrick again at his residence on January 7, 2014, and obtained Patrick's school records from Fairless Intermediate School. The purpose of the *GL*'s visit was to address arguments made during the evidentiary hearing that Patrick's desire to remain in the United States was based on his belief that Ms. Bowen and Patrick's siblings ultimately would be moving to the United States, too. Subsequent to the *GL*'s first two visits and before the evidentiary hearing, Patrick was made aware that his

mother and siblings would not be relocating to the United States. It was the *GL*'s conclusion after her third visit with Patrick that he was sad about this development, and sad about the separation of his family. Supp. Rep. at 1. Nevertheless, the *GL* stated that Patrick continued to express his desire to stay in the United States. *Id.* Patrick acknowledged that he was worried about hurting his mother's feelings by staying in the United States, but explained that "his mother never did anything with him in Ireland" and that he was closer to his father at that time as well. *Id.* at 1-2.

The *GL* concluded that Patrick, at 10, "appears to be a young boy of at least average intelligence and maturity," who "understands that his parents are not likely to reconcile and that his mother and siblings are not coming to the United States to live," and acknowledges that he is sad about the disunion of his family but "[r]egardless of these feelings, however, he remains certain that he wants to stay in the United States, a relatively mature stance for a 10-year-old who has not seen his mother or siblings for over a year." *Id.* at 3-4. In reaching her determination that Patrick has sufficient maturity for this Court to consider his objection to returning to Northern Ireland, the *GL* "took into account Patrick's age, his level of maturity, his understanding of the current situation, his capacity to form and express views, whether his views on this issue are grounded in reality, whether his views have been shaped by any undue pressure or influence and his ability to discern what is in his own best interests from a short and long term standpoint." *Id.* at 2-3.

The *GL* found that Patrick's reasons for not wanting to return to Northern Ireland were "fairly well-grounded in the world of a ten year-old, i.e., that he was born in the United States, that he would be sad if he had to return to Ireland, that he feels closer to his father than his mother and that the racial mix of the population is different in his present environment than it is

in Ireland." *Id.* at 3. The *GL* did note that Patrick provided other reasons for his desire to remain in the United States that did not appear to have originated from his independent reflection, such as the fact that he has family in Tennessee (that he has not yet met) and the existence of racism towards his father in Northern Ireland. *Id.* However, the *GL* concluded that it did not appear that any undue influence was imposed on Patrick in order to shape his desire to stay in this country, and importantly, Patrick has never wavered, either prior to or after learning that his mother was not moving to the United States, in his position from the outset of this litigation that he wants to remain in the United States. *Id.* at 3-4. Importantly, the *GL* noted that Patrick "appears to have considered the short and long term impact of leaving the country of his birth and living with his mother and not his father." *Id.* at 4.

This Court finds that the *GL*'s conclusions about Patrick's degree of maturity is consistent with the record as a whole. Patrick has been at the epicenter of a marriage identified by its dysfunction, and it appears to this Court that Patrick has emerged, at ten years old, with a marked sense of maturity honed through his family's various trials and tribulations. As the *GL* noted in her initial Summary Report, Patrick, while he lived in Northern Ireland, lived at several different homes as his parents' volatile relationship moved from one seemingly insurmountable conflict to another. As Ms. Bowen testified, she and her children first lived with Mr. Bowen in a house in Northern Ireland, then in June of 2010 she and her children moved into a women's shelter in Belfast, then into a women's shelter in Newry, then, upon the parties' reconciliation, to Southern Ireland in the summer of 2011, and then back to Newry.

Patrick's maturity in the face of such unpredictable discord in his parents' marriage is plainly reflected in his final Newry report card, in which the evaluator stated that even as a fifth grader, Patrick was "open to sorting out situations of conflict amongst his peers," that he

understands "how our choices affect others," that he "underst[ands] that differences in each other are to be celebrated," that "Patrick has shown that he understands others' points of view and is willing to co-operate to identify steps to help him improve his work," and, as noted above, that Patrick "has shown a great ability to work with other children in practical activities." Ex. A, ECF No. 28-1, at 2. Furthermore, Patrick's ability to continuously improve his grades in school since his arrival in the United States, *see id.* at 5-6, demonstrates his maturity in managing his scholastic responsibilities while his parents and siblings remain split across two continents, and while he is faced with the steady disintegration of his parents' relationship.

In its seminal decision on the "wishes of the child" defense, the *Tsui* court cautioned that a court should not find that such a defense has been established when "it was the passage of time during the years of wrongful retention and litigation of this case that created [the child]'s desire to remain in Pittsburgh," because if the court applied the defense in such a case, "it would encourage parents to wrongfully retain a child for as long as possible." *Tsui*, 499 F.3d at 280. However, here, the record is devoid of any indication that the passage of time generated Patrick's desire to remain in the country of his birth, or that the passage of time was going to change or is going to change Patrick's desire to remain in the country of his birth. Instead, the record reflects the reality that Patrick's desire to remain in the United States is grounded in factors that exist independent of Patrick's time in the United States – his consideration, as the *GL* noted, of the short and long term impact of leaving the United States and living with his father and not his mother, his explanation that even in Northern Ireland, he was closer to his father than his mother, and his unwavering desire to remain in the United States both prior to and after learning that his mother was not going to relocate to the United States, after all.

While this Court acknowledges that Mr. Bowen's "wishes of the child" defense would be a closer call if these wishes were the sole reason underlying this Court's repatriation decision, here, Patrick's wish to remain in the United States, coupled with Ms. Bowen's actions demonstrating her consent with Patrick's move to the United States with Mr. Bowen, and with Ms. Bowen's acquiescence, at least until her letter to Mr. Bowen in November of 2012, reveals that while Ms. Bowen has established her *prima facie* case of wrongful removal, Mr. Bowen has proven (when considered separately, and as to the last, in conjunction with one another) the affirmative defenses of consent, acquiescence, and the "wishes of the child," which counsels that this Court deny Ms. Bowen's Verified Petition.

### D. A discretionary order of Patrick's return to Northern Ireland is not appropriate.

Even though Mr. Bowen has established the aforementioned affirmative defenses to return, "the court retains the discretion 'to order the return of the child if it would further the aim of the Convention[,] which is to provide for the return of a wrongfully removed child.'" *Tsui,* 499 F.3d at 278 (quoting *de Silva,* 481 F.3d at 1285); *see also* Hague Convention, art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.").

However, a discretionary order of return is not appropriate in this case. While one aim of the Hague Convention is "to provide for the return of a wrongfully removed child," *Tsui,* 499 F.3d at 278, the Hague Convention's Preamble emphasizes both that "the interests of children are of paramount importance in matters relating to their custody" and that one of the Hague Convention's objectives is "to protect children internationally from the *harmful* effects of their wrongful removal or retention," Hague Convention Preamble (emphasis added). It is apparent that through this lens, the Hague Convention's drafters conceived of the two exceptions to the

return of a child in cases where that child has become well settled or where that child demonstrates a sufficient degree of maturity such that it is appropriate for the court can take that child's wishes into consideration. *See* Hague Convention, art. 12, 13; *Ramirez v. Buyauskas*, 2012 WL 606746, at *20-21, -- F. Supp. 2d -- (E.D. Pa. Feb. 24, 2012) *amended*, 2012 WL 699458 (E.D. Pa. Mar. 2, 2012). As discussed above, this Court concludes that this is one of those latter cases. Patrick has demonstrated a marked degree of maturity such that it is appropriate for this Court to take into consideration Patrick's desire to remain in Pittsburgh. A discretionary order is not justified under the circumstances.

E. **Alternatively, if this Court analyzed Patrick's habitual residence using the November 2012 date of Ms. Bowen's letter to Mr. Bowen as the date of a wrongful retention, this Court would also deny Ms. Bowen's Verified Petition.**

As explained above, this Court has found and concluded that Ms. Bowen plainly consented to Patrick's removal and acquiesced in it until November of 2012, when Ms. Bowen wrote Mr. Bowen a letter requesting that he "do the right thing" and send Patrick back to Northern Ireland to live with her. While Mr. Bowen does not affirmatively call into question Ms. Bowen's claim that July 20, 2012 is the date of Mr. Bowen's allegedly wrongful removal of Patrick, Ms. Bowen's uncontroverted testimony that she demanded that Mr. Bowen return Patrick to Northern Ireland in November of 2012 would have rendered that latter date the actual date of allegedly wrongful retention, based on the evidentiary record before the Court. *See Tsui*, 499 F.3d at 269 (affirming the district court's determination that under the factual scenario before that court, the date on which the petitioner demanded the return of the child was the date of allegedly wrongful retention, not the date on which the child left the petitioner's care). Thus, for the sake of completeness, this Court will consider the effect of that date on the disposition of Ms. Bowen's Verified Petition.

Under this analysis, the Court must determine the habitual residence of Patrick immediately prior to his "wrongful" retention in the United States in November of 2012. As the *Karkkainen* court noted, the habitual residence analysis "considers a child's experiences in and contacts with [his] surroundings, focusing on whether [he] developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places [he] encountered in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (internal citation omitted).

On July 20, 2012, Patrick and Mr. Bowen relocated from Northern Ireland to the United States, where they moved in with Clara Jones, Mr. Bowen's ex-sister-in-law, and her husband Ricky Jones, in Pittsburgh, Pennsylvania. (Mr. and Ms. Bowen had lived with the Joneses after they first met in Pittsburgh, and before they moved to Tennessee.) One month prior, Patrick had received his final report card from St. Patrick's Primary School in Newry, Northern Ireland, in which his teacher wished him "[g]ood luck with your new life in America!" Ex. A, ECF No. 28 at 2.

In Pittsburgh, Patrick became firmly established in the school system and in his community. Patrick enrolled as a fifth-grader at Fairless Intermediate School (where his Newry school records were sent), regularly attended Fairless, received updates on his vaccinations, and played baseball in the community. *Id.* at 3, 4, 6; *see Feder*, 63 F.3d at 224 (noting that academic activities are among "the most central activities in a child's life" and therefore quite suggestive of acclimatization); *Karkkainen*, 445 F.3d at 293 (citing to *Feder* for the same proposition); *id.* (noting, approvingly, the Ninth Circuit's weighing of a child's participation in sports programs in favor of acclimatization). Mr. Bowen testified that Patrick's relationship with Mr. and Mrs. Jones was (and continues to be) quite close, with Mr. Jones treating Patrick as he would his own

child, and Mrs. Jones acting as a surrogate mother to Patrick, buying him clothes and taking care of any expenses relating to his education at Fairless. *See also* Summ. Rep., ECF No. 19. The record reveals that even in four months' time, between July 20, 2012 and November of 2012, Patrick had developed "a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places [he] encountered" in his new home and school in Pittsburgh. *See Karkkainen*, 445 F.3d at 292; *cf. Tsui*, 499 F.3d at 272 (affirming the district court's conclusion that a five-year old child, who was in the United States only a few weeks when the wrongful retention occurred, was both too young to have an intent regarding her habitual residence and had lived in the United States for too short a time to acclimatize before the wrongful retention occurred).

As for Mr. and Ms. Bowen's shared intent regarding Patrick's presence in the United States up until Mr. Bowen's allegedly wrongful retention of Patrick in November of 2012, this Court, as explained above, found and concluded that Ms. Bowen consented to Patrick's departure for the United States with Mr. Bowen as part of the Bowens' ultimate plan to relocate to and unify their family in the United States, and what barred the family's state-side unification and anticipated "fresh start" was the ban on Ms. Bowen's visa, not the Bowens' marriage problems.

It follows that until Ms. Bowen wrote Mr. Bowen that November 2012 letter requesting that he send Patrick back to Northern Ireland, the Bowens' shared intent regarding Patrick's presence in the United States, from as early as May of 2012 when Ms. Bowen bought the entire Bowen family one-way tickets to this country, was that Patrick would relocate to the United States with Mr. Bowen, who would work with his attorney to resolve Ms. Bowen's visa issues so that she could finally move to the United States with the parties' remaining children.

For these reasons, an analysis of Patrick's habitual residence with November 2012 as the date of allegedly wrongful retention would render the United States as Patrick's habitual residence immediately prior to that allegedly wrongful retention. By November of 2012, Patrick had, over four months' time, acclimatized to the United States, his conduct demonstrated a degree of settled purpose in this country as he built "a new life," and his parents had a shared intent, up until Ms. Bowen's November 2012 letter, that the entire Bowen family would relocate to the United States.[16]

Critically, "[a] petitioner cannot claim that the removal or retention of a child is 'wrongful' under the Hague Convention unless 'the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in a *different state*.'" *Tsui*, 499 F.3d at 270 (quoting *Karkkainen*, 445 F.3d at 287 (emphasis in original)). As the *Tsui* court explained when it analyzed the allegedly wrongful removal of a child from Canada to the United States, "if we hold that the United States was [the child's] habitual residence at [the time of his allegedly wrongful retention], the analysis is complete as the Hague Convention would not apply because [his] retention in the United States would not be wrongful as defined by Article 3." *Tsui*, 499 F.3d at 271 (citing *Karkkainen*, 445 F.3d at 291).

---

[16] In *Karkkainen*, where the child had stayed in the United States for less than three months, the Third Circuit noted that "even a mature eleven-year old may not be able to acclimatize to a new country in such a short period of time." *Karkkainen*, 445 F.3d at 294. However, the *Karkkainen* court was faced with a factual scenario in which the child's parents intended, at the time the child left Finland for the United States, that the child would be able to choose where she wanted to live after a few months in this country. *Id.* The court concluded that under those factual circumstances, in addition to facts demonstrating the child's enrollment in school, her efforts to connect with her stepmother in the United States, and her marked maturity and intelligence for her age, "less time was required for [the child] to acclimatize and demonstrate a degree of settled purpose to stay in the United States than would normally be the case." *Id.* at 295.

While here the record certainly does not reveal that the Bowens intended that Patrick live in the United States for a few months and then decide, all by himself, whether he wanted to permanently live in this country, the record evidence that Patrick was to begin a "new life in America," that he enrolled in Fairless Intermediate School in Pittsburgh, engaged in his new community via extracurricular sports, built meaningful relationships with Mr. and Mrs. Jones who became, for all intents and purposes, surrogate parents to him, and has significant maturity for his age, demonstrates that like the situation in *Karkkainen*, "less time was required for [Patrick] to acclimatize and demonstrate a degree of settled purpose to stay in the United States than would normally be the case." *See id.*

Because the United States would be Patrick's habitual residence under a November 2012 date-of-wrongful-retention analysis, the analysis then ends, as the Hague Convention does not apply because Patrick's retention in the United States would not be "wrongful," as defined by Article 3.

      **F.    Ms. Bowen is not entitled to fees and costs.**

Ms. Bowen seeks to recover "all legal costs and fees incurred to date, as required by 42 U.S.C. § 11607." V. Pet. at 8. However, under ICARA, an award of costs and fees is only appropriate when a court orders the return of the child. 42 U.S.C. § 11607(b)(3). Because this Court is not ordering the return of Patrick to Northern Ireland, this Court denies Ms. Bowen's request for fees and costs.

## III.    CONCLUSION

The Bowens have no doubt suffered critical breakdowns in their marriage that have entangled Patrick in their web of marital discord. However, at the heart of this case is Patrick, and this Court's resolution of this matter must reflect both the need "to protect children internationally from the harmful effects of their wrongful removal" and the "paramount importance" of Patrick's interests, as codified by the Hague Convention and ICARA. For the reasons set forth above, this Court denies Ms. Bowen's Verified Petition.

                                        Mark R. Hornak
                                        United States District Judge

Dated: May 22, 2014

cc: All counsel of record